## Borough of Austin v. A. & P. Corrugated Box Corporation

*Marvin D. Power*, of *Margiotti & Casey*, and *M. J. Maggio*, for plaintiff.

*S. Dale Furst*, of *McCormick, Herdic & Furst, Harry Alvan Baird*, and *James S. Berger*, for defendants.

LARRABEE, P. J., August 12, 1947.—This case came before the court en banc on argument had on motions filed by defendant for a new trial and for judgment non obstante veredicto.

Defendant presented a petition to the Supreme Court of Pennsylvania asking for a change of venue and on June 7, 1946, an order was made directing that the case be tried in the Court of Common Pleas of Lycoming County, twenty-ninth judicial district, before Judge D. M. Larrabee, as presiding judge; the costs and expenses incurred in these proceedings to be paid by the County of Potter, as provided by the Act of March 30, 1875, P. L. 35, sec. 6, 12 PS §116.

This is an action of trespass brought to recover damages to certain of the streets of the Borough of Austin,

Pa., which the borough alleges resulted from flood waters caused by the negligence of defendant company in its care and maintenance of a certain water storage dam located on the North Branch of Freeman Run about two miles north of said borough. The trial of the case covered a period of 10 days and resulted in a verdict in favor of plaintiff for $35,000.

It appears that this dam was operated and maintained by the Williamson Pulp & Paper Company at the time the alleged damage occurred on July 18, 1942, and on June 4, 1943, by resolution of its board of directors, the Williamson Pulp & Paper Company caused its corporate name to be changed to the A. & P. Corrugated Box Corporation.

Plaintiff's claim is based on the theory that defendant company kept, maintained and operated this dam in such a defective condition that it suddenly gave way on the forenoon of July 18, 1942, thereby causing the water to pour through the breach and rush down the North Branch of Freeman Run into the Borough of Austin, flooding several of the streets and damaging the same.

In defense of this charge defendant contends that the flood water which damaged the streets of Austin was the result of an act of God; that it was caused by an extraordinary downpour of rain that began the night before and continued until two o'clock in the afternoon of July 18th, and which rainfall, defendant alleges, covered the entire watershed of the North Branch of Freeman Run.

The testimony shows that the structure of this dam was formed of logs and large timbers laid in a longitudinal manner across the bed of the stream from hillside to hillside, and fitted together end to end, and layers of timbers were placed on top of these crosswise at right angles, and then other rows of longitudinal timbers were placed on the top thus forming a chain of so-called cribs, and commonly known as a timber

crib dam. These log cribs were filled in with broken rocks and shale and over the top of these timbers and rocks a so-called "plank bucking" was laid to prevent water going through the cribbing and the top of the dam was then covered its entire length with earth several feet in depth. The dam had an opening on the top, at the center, formed of heavy plank, known as a spillway, over which water from the dam could flow freely when the water reached a certain height.

This dam was 580 feet in length across the top, 32 feet in height facing upstream, and the reservoir formed by the dam had a capacity of 65,000,000 gallons at the spillway crest.

It appears the original dam was built in 1910, and in 1917 the Bayless Manufacturing Company, which formerly owned and operated the paper mill now operated by defendants, submitted plans to the Water Power Commission of Pennsylvania for improving and changing the dam and that same year a permit was issued to said Bayless Manufacturing Company by the Water Power Commission, to change the dam in accordance with the plans filed by the commission. The witness, C. K. Weigle, of the Department of Forests and Waters, testified that the Water Supply Commission received notice from the Bayless Company in a letter dated January 6, 1921, that the work of improving the dam had been completed; and the company stated to the commission that the purpose in improving and changing the dam was to raise the "normal flow line" of the reservoir two feet, that is, to permit the dam to impound more water than it previously had.

It is undisputed that the watershed of the North Branch of Freeman Run, which comprises 13.4 square miles of territory, was visited by a very heavy rain storm, beginning about midnight of July 17th and 18th, and continuing until about two o'clock on the afternoon of July 18th. There is considerable undisputed testimony that about 11:30 o'clock on the forenoon of

July 18, 1942, the center of this dam in and about the spillway section suddenly gave way which resulted in a large volume of water rushing down the stream into the Borough of Austin, which lay to the south of said dam; that the current of this stream was of sufficient depth and force that dwellings and other buildings along the stream were swept from their foundation and floated down and lodged against the Elliott Street Bridge, and against Sharp's Garage at the northern edge of the borough, and the paving on some of the concrete and brick streets was torn up and the streets washed out in places.

As to the appearance of the flood current as it swept down the North Branch of Freeman Run immediately after the dam failed, Frank Sinon testified he was at his parent's home at the northern edge of the Borough of Austin, at a point about a mile and a half below this dam, and at about 11:30 on the forenoon of July 18th he saw a "large muddy colored stream or wave" suddenly coming down Freeman Run and this wave appeared to be in the center of the main current of the stream and higher than the rest of the stream, and shortly after 11:30 o'clock that forenoon there was a drop in the volume of the stream.

James Kilduff, an employe of defendant company, said the volume of the stream was at its highest about 11:30 a.m.

Fred Cooper said he closed his store somewhere between 11:15 and 11:30 after he heard the fire siren blow and went to the bridge on Main Street over the North Branch of Freeman Run; the stream was then rising rapidly and large trees and logs floated down; that the water was then darker in color and the stream carried some frame buildings which lodged against Sharp's Garage and formed a dam there.

Hiram Hackett said "all of a sudden" the water came rushing down the stream and a barn and house were swept down with it, and the stream turned to a

muddy color and proceeded to spread out over Railroad Street.

Lloyd Tyler said he saw the high water coming down the stream between 11 and 12 in the forenoon and described it as a wave of dark colored water.

Madeline DeMark, who resides with her parents on the left side of Freeman Run near the northern edge of the borough, testified that when she heard the fire alarm whistle about 11:30 a.m. she and her parents left their home and went up on a hill from where she saw a wave of water coming down Freeman Run and her home was swept away by the flood, and she saw a building used as a beer saloon float against the Elliott Street Bridge. Her father, Domineck DeMark, testified about 11:15 that morning he left his home, after hearing the whistle alarm blow, went up on the side hill and saw a wave of water four or five feet high coming down the stream.

As to the height of the water in the reservoir of this dam shortly before it failed on July 18th, James Kilduff, an employe of defendant, said on his third trip to the dam that morning between 9 and 9:30, the water was about four feet below the top of the dam and at that time water was running through under the spillway and he, with other employes of defendant, was instructed to place sand bags on the upstream side of the dam in front of this spillway. Kilduff said sometime after 11 o'clock in the forenoon when he returned to the borough from his fourth trip to the dam the water was then running in the streets of the borough; he said it was 11:40 to 12 noon when the water was the highest, and the water was then eight feet deep in the streets, and by 4 o'clock that afternoon it had dropped to four feet in depth.

Floyd Brooks, employed by defendant company, said when he went to the dam that forenoon for the first time it was after 10:15 and when he went there the

second time "the dam was giving way" and some of the spillway had already gone out, and while there he saw more of the spillway give way and at that time the water was about two to two and a half feet below the top of the earth embankment across the top of the dam. Brooks said at no time while he was there did the water come over the earthen embankment at the top of the dam.

Two other employes of defendant, J. H. Beebe and Andrew VanEpps, testified they were directed to go to the dam that forenoon and help place sand bags in front of the center spillway where Beebe said water was eating its way into the dirt at the spillway.

E. L. Elliott, who was president of defendant company at the time, testified he visited the dam at 7 o'clock that morning, later about 9 o'clock; that at 7 o'clock the water was between four and five feet below the top of the dam and at 9 o'clock the water was passing out over the top of the spillway and leaking under the spillway. He said at five minutes after 12 that noon he again visited the dam and a section of the center of the dam, twice the length of the spillway, had gone out and water was pouring through the breach.

As to any previous occurrences of high water on the North Branch of Freeman Run, it was testified to by the witnesses, Bert Straw, James Kilduff, Madeline DeMark, Fred Cooper, and Hiram Hackett that that stream had been visited with high water and flash floods from time to time, and that the flash flood of 1936 was unusually high water. Straw testified the flood of 1942 was different from the ordinary flash flood and did greater damage.

As to the condition of the roads and highways in the area of said watershed immediately following this storm, Guy Crosby and his brother, Frank, said they had never seen washouts as extensive there, nor any storm in that vicinity comparable to the one of July

1942; that a bridge at the mouth of a small stream had been moved 50 feet downstream from its normal position as the result of this high water and the abutment of one end of a small bridge near the home of Guy Crosby had been washed out and pieces of land about 15 feet square on a hillside at his farm had been loosened and slid down onto other land.

The court instructed the jury fully on the question of negligence, contributory negligence, and proximate cause, and told the jury the burden was upon plaintiff to prove the negligence of defendant by the fair preponderance of the evidence.

The trial judge also instructed the jury on what constitutes a so-called act of God as follows:

"An act of God is an unusual, extraordinary, sudden, and unexpected, manifestation of the forces of nature and from which injury results, and such as could not be prevented by human care, skill and foresight": See 38 Am. Jur. 649.

On the question of liability where an act of God concurred with the negligence of a defendant in causing the damage the trial judge instructed the jury as follows:

"If the jury find from all the evidence this flood of July 18, 1942, on the North Branch of Freeman Run was an act of God, and was of such overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown on the part of the defendant, it produced the injury to the Borough of Austin, complained of here, then there would be no liability on the part of defendant company, even though you found there was negligence in the operation and maintenance of this dam by defendant, and your verdict then should be in favor of defendant.

"However, when the negligence of a defendant combines or concurs with an act of God to produce the injury, then defendant is liable if the injury complained

of would not have resulted but for his own negligent conduct or omission, or failure to exercise care.

"That is to say, he whose negligence joined with the act of God in producing the injury, is liable therefor. That is, the negligence must be a substantial factor in producing the injury.

"If the jury were to find from all the evidence that this heavy rainfall on July 17th and 18th on the North Branch of Freeman Run was so extraordinary that it was an act of God, and if the jury also find defendant was negligent in the care and maintenance of this dam, and if the jury also find that this flood damage would not have occurred to the Borough of Austin but for the negligence of defendant in concurring with the act of God, then defendant would be liable, and the Borough of Austin would be entitled to recover a verdict for damages at your hands. That is, not by an act of God of itself, but where an act of God concurs with the negligent act of defendant.

"To create liability as to defendant, it must have required the combined effect of the act of God and the concurring negligence of defendant to produce the injury complained of, and the negligence of defendant must have been a substantial factor."

These instructions are in accord with the rule laid down in Baltimore & Ohio Railroad Co. v. Sulphur Spring Independent School District, 96 Pa. 65; Rife v. Middletown, 32 Pa. Superior Ct. 68; Engle v. Luzerne County Gas Co., 36 Pa. Superior Ct. 311; and Elder v. Lykens Valley Coal Co., 157 Pa. 490, 38 Am. Jur. 719.

The jury was also instructed that in passing on the question of whether this high water was an extraordinary flood and the result of an act of God, it should take into consideration, from the testimony and maps and photographs introduced in evidence, such factors as the nature and duration of the rainfall on this watershed immediately preceding this high water, the size

of the area of the watershed of the North Branch of Freeman Run, which it was testified to is 13.4 square miles; also the nature of the terrain and topography of the watershed, including such matters as the slope of the hills, whether steep or gradual, and the width of the valley through which this stream passed to reach the point where it fed into the reservoir formed by this dam, as well as the width of the stream and the terrain from the dam down to the Borough of Austin, two miles below. This for the purpose of enabling the jury to determine whether the topography was such as likely to cause water to rush quickly into said stream and produce high water in a short time and cause unusual floods: Baltimore & Ohio Railroad Co. v. Sulphur Springs Independent School District, 96 Pa. 65, and Brown et ux. v. Railroad Co. et al., 183 Pa. 38.

The jury was further instructed to take into consideration whether the testimony showed there had been any former instances of unusually high water on this stream; that if there had been other floods in this stream and they were approximately of equal height and volume as the one occurring on July 18, 1942, the jury might be justified in finding this flood was not such an extraordinary or unusual one as to render it an act of God. That for a flood to be extraordinary it must be different in the characteristics of force, suddenness and volume from one that is ordinary and if the jury found there had been no floods in recent years on this stream equal in height and volume, approximately of the waters of this flood of July 18, 1942, the jury would be justified in finding this flood was an extraordinary one.

As to the duty devolving on defendant company the court instructed the jury that when defendant took over the supervision and care of this dam it knew or, in the exercise of ordinary care, should have known that in thus impounding a large volume of water it owed a duty to keep and maintain the dam in a proper

state of repair. That it was the plain duty of defendant on its own initiative and responsibility to have this dam examined and inspected from time to time to ascertain the true condition of the structure and to keep it at all times in a state of good repair.

That in maintaining and supervising this dam defendant was bound to bring to its construction, maintenance and repair the engineering knowledge and skill ordinarily known and practiced in the construction and maintenance of such storage dams: Pittsburgh, Fort Wayne & Chicago Ry. Co. v. Gilleland, 56 Pa. 445; Baltimore & Ohio Railroad Co. v. Sulphur Springs Independent School District, 96 Pa. 65.

Whether defendant fulfilled this duty down to the time when this dam failed on July 18, 1942, was a matter for the jury to determine.

C. E. Weigle, chief of the division of dams of the Pennsylvania Department of Forests and Waters, testified that he has charge of the supervision of dams through the State of Pennsylvania; that on February 28, 1941, he filed a report on conditions he found at this dam with the Department of Forests and Waters which report was first turned over to Charles H. Ryder, chief engineer of the department, and it was then delivered to the Secretary of the Department of Forests and Waters. Weigle, on the stand, read from this report for the purpose of showing the conditions of the dam when he examined it on January 24, 1941, and again on February 20, 1941. He stated that on February 20, 1941, he found the entire dam had settled three feet; that there was a leakage at various points in the dam which he estimated to be at the rate of 2,000 gallons per minute, and, in his opinion this "excessive leakage" indicated that the fill which had been placed on the face of the cribs was of poor quality. Weigle further stated from this report that "Apparently the timber crib in the center of this dam has decayed badly during the 30 years which it has been

in place and has allowed the entire dam to settle. Further decay will proceed more rapidly since the dam will not impound water during low flood periods." It will be noted this report was made more than a year before this flood occurred.

Weigle said that on September 17, 1941, following a letter written by the Secretary of the Department of Forests and Waters to someone in Potter County concerning this dam, E. L. Elliott and Harry K. Williamson came to the office of Mr. Ryder, chief engineer of the department, at Harrisburg, for a conference about this dam; that Weigle was present at the conference. It appears that Elliott and Williamson represented the owners of this dam. Weigle said they discussed what measures should be taken in connection with the dam, and Elliott and Williamson were then informed by Ryder and Weigle that the "dam was unsafe and it should be breached"; and the Williamson Pulp & Paper Company was instructed to make an application to the department for a permit to breach the dam. They were also informed that the breach should be made so that the top of the dam would be only four feet above the level of the bed of the stream. Weigle said that Elliott and Williamson agreed to do this and that within a few weeks they were going to put in a power shovel and breach the dam.

E. L. Elliott, on the stand, "would not deny" that he and Williamson at this conference at Harrisburg had promised that his company would breach the top of this dam down to a level of four feet above the bed of the stream.

Elliott testified that he was president and Harry K. Williamson was vice president and general manager of the Williamson Pulp & Paper Company, the former name of defendant company, in July 1942, at the time of this flood.

On the question of whether defendant company had acted upon this notice given its officers to breach the

dam, five employes of defendant, James Kilduff, J. H. Beebe, Andrew VanEpps, John MacMartin and Hiram Hackett, as well as Lloyd Tyler, who resided a short distance above the dam, testified that no improvement work of any kind whatsoever was made to the dam from the date of said conference at Harrisburg down to the date of this flood, July 18, 1942, and the top of the dam had not been lowered from its original height.

It is significant to point out that no testimony was offered by defendant to show that any work had been done to lower the face of this dam, as it had been notified so to do at the conference in Harrisburg on September 17, 1941.

At this juncture in the trial counsel entered the following stipulation on the record:

"It is stipulated by and between counsel for plaintiff and counsel for defendant that the present named defendants, the A. & P. Corrugated Box Corporation, has notice of whatever conversation occurred in Harrisburg on September 17, 1941, in the Department of Forest and Waters, between Edward L. Elliott, Harry K. Williamson, C. E. Weigle and Charles E. Ryder, pertinent to this case."

William Lance, a consulting engineer, called by plaintiff, testified he first saw this dam in May 1943, and at that time found the stone filling washed out and the timbers "in very bad condition", and in answer to a hypothetical question said, in his opinion, the high wave of water that was testified to as flowing down Freeman Run below this dam about 11:30 in the forenoon of July 18th, was caused by the failure of the center spillway of the dam due to the settlement of the walls of the spillway and the fracture of one of these walls; and if the dam had been breached as recommended by the Department of Forests and Waters the dam would not have failed on July 18, 1942. Lance said the fact that the dam had settled three feet

since it was built 32 years ago indicated disintegration of the timber cribbing and possibly a reduction in the height of the earthen embankment, due to the passage of the dirt fill through the leakage of the dam, and that the heavy rainfall of July 18th had filled the reservoir to a point where the weakness of the dam became a vital factor in its failure.

Norman Sprague, a registered engineer in the Commonwealth of Pennsylvania, a consulting engineer for 27 years, and formerly district engineer of the Highway Department of the City of Pittsburgh, and who is now an engineering member of the State Board of Arbitration of Claims, made a personal examination of the remnants of this dam on April 6, 1943; that he also noted the topography of the land in general in that locality. In answer to a hypothetical question reciting the evidence as to the heavy rain and flood conditions, and the volume of water seen in the stream below this dam, on the day of this flood, Mr. Sprague said, in his opinion, the primary cause of the failure of the center portion of the dam at the spillway "was on account of its inherent weakness due to the rotting and decayed condition of the timber crib in the core of the earthen embankment." He also said there was no adequate bond or watersill between the concrete sidewalls of the center spillway and the earthen embankment on the sides, and if the dam had been breached down to a four-foot level on the upstream side of the dam it would not have failed on July 18, 1942. Sprague said the purpose of a watersill or concrete seam, where the spillway abuts against the earthen sides of the dam will prevent water from the reservoir running alongside the spillway wall and eating away the earth embankment; if this dam had settled three feet since its original construction, as mentioned by Weigle in his report, it was an indication of deterioration and decay of the wooden cribbing in the core of the dam.

Charles E. Ryder, called by defendant, testified he was present at the conference held at the office of the Department of Forests and Waters on September 17, 1941, with Elliott and Williamson, also Weigle, that the report of what took place at that conference as already testified to by Weigle "is substantially as he remembered it". Mr. Ryder said that in his opinion, based on engineering theory, even if the water had gone out of this dam in one hour's time, it would have caused a depth of only one foot of water on Main Street in the Borough of Austin. He also gave as his opinion that even if the dam had been breached before the day of this flood, as recommended to Elliott and Williamson in Harrisburg in September 1941, it would not have made much difference in the height of the water in the Borough of Austin, and although such a recommendation to breach the dam was a proper engineering one at the time yet, in his opinion, even if that had been done the dam would have failed in this flood.

Ryder further said that leaks in a dam of this kind were "danger signals" but he did not think the water from this dam did any substantial damage to the Borough of Austin in July 1942.

Upon cross-examination, Ryder was shown a supplemental report appended to the report read in evidence by Weigle, as made to the Department of Forests and Waters, under date of February 28, 1941, when Ryder was chief engineer of the Department of Forests and Waters, which supplemental report was signed by Ryder as chief engineer and in which he said, in referring to the condition of this dam: "That at the present time it is unsafe with the probability of failure should a flood occur in Freeman Run . . . it is accordingly recommended that the company be directed to appear before the board at its next meeting, to show cause why an order should not issue for the removal of the dam as being unsafe and unsusceptible

of repair." Mr. Ryder was then asked if he did not sign such a statement and he said he did.

Defendant sought to introduce in evidence testimony as to the appearance of the volume of water in the stream known as the West Branch of Freeman Run, which joins the North Branch at a point at the southern or lower end of the borough, a distance of 1,100 feet south of Main Street. This for the purpose of attempting to show general flood conditions in that area, also that high water from the West Branch discharging into the North Branch would tend to cause water to back up in the North Branch into the borough and that such backwater might be considered as causing some of the damage to the streets. The court sustained an objection to the testimony and ruled it out for the reason that under the authority of Brown et ux. v. Railroad Co. et al., 183 Pa. 38, it was held that evidence of high water in other streams was not material and was not competent evidence. The West Branch of Freeman Run is fed by an entirely separate and distinct watershed from the watershed that feeds the North Branch; that a mountain ridge divides the watersheds of those two streams. Furthermore it is well known that some streams in a given area, even in a general flood situation, are higher than others, and storms often strike with greater severity in one section when only a short distance away the storm is less severe.

We are of the opinion that even though it would have been possible to show that water discharged from the West Branch into the North Branch at the lower end of the borough, 1,100 feet below where Main Street is situated, had caused the water in the North Branch to back upgrade along the channel of the North Branch, at the most it is apparent it would be in the nature of still-water by the time it reached Main Street and the pressure, if any, exerted by it on the surface of the street would be static. Further-

more, as to Main Street which crosses the North Branch at right angles, any water that might back upstream from the mouth of the West Branch would first come in contact with the rear of the row of business places and residences on the south side of Main Street. There was direct, positive testimony that the damage to Main Street was caused by the onrush of flood waters coming down the North Branch, which reached the borough shortly before noon and this eye-witness testimony was given strong corroboration by the photographs showing the logs, trees and heavy debris deposited on Main Street in front of the business places and residences, all of which faced upstream towards the dam in question. These photographs, as well as the testimony of witnesses, also show that on Main Street and Goodyear Avenue, the street pavements were not only torn up and streets washed out in many places, but large squares of concrete sidewalk were torn from their place and thrown out into the center of the streets. It is obvious such damage would not be caused by any still water that might possibly have backed on to said streets. It is self-evident from an inspection of these photographs that such damage must have been caused by a swift, violent current of flood water rushing directly on to these streets from the north. Furthermore, Elliott and Turner Streets lie along the North Branch and farther north than Main Street toward the dam and therefore would be among the first streets to be reached by the flood stream coming down the North Branch from this dam, and it is inconceivable that any water could be backed from the mouth of the West Branch so far upgrade on the North Branch as to even reach Turner and Elliott Streets, and this same reasoning would apply to the gouging out and altering of the channel of the North Branch.

We are of the opinion this question comes within the ruling in Rife v. Middletown, 32 Pa. Superior Ct. 68, where a somewhat analogous flood condition was shown.

Defendant offered in evidence a small photograph taken two days after this flood showing a considerable section of this dam still standing, and from which the witness, C. K. Weigle, said he thought it showed a place where the water had overflowed or "topped" the dam. However, Weigle admitted, "it appears to be slight at the top of the dam". In contradiction of this the witness, Floyd Brooks, said he was at the dam just as it began to give way that forenoon and the water in the reservoir was then about two and one half feet below the top of the dam and he was positive the water did not overflow the top of the dam. Other photographs taken two days after this flood showed a growth of vegetation and weeds growing on the earthen embankment on top of this dam, which vegetation is standing upright and appears to be undisturbed, and none of the earth top of this section of the dam appears to have been disturbed or washed away, such as might ordinarily be expected as a result of flood waters surging over the top of the dam.

Counsel for defendant offered in evidence a tabulated list of data purporting to show the amount of rainfall on July 18, 1942, at various places in the area surrounding the head waters of the North Branch of Freeman Run, as well as adjacent watersheds. However, the witness, James E. Stewart, by whom it was proposed to show how this data was obtained, admitted he had gathered his information from farmers and residents scattered over the area who had told him of the amount of water they had found in various kinds of receptacles which happened to be exposed to the rainfall on their premises. Stewart admitted he was not present and had not observed any of the rainfall on July 18th and this data was gathered by him sometime afterward. Furthermore, an inspection of this

tabulation showed it stated on page three that no official observations in the region of the Borough of Austin of this rainfall were available and it also appeared, in a heading on this tabulation, that the data offered was an unofficial report. The offer was objected to by plaintiff on the ground that it was tabulated from purely hearsay sources and in addition, on the face of it, was admitted to be an unofficial report. The court sustained the objection.

In fixing the time when the dam gave way and the water was highest in the stream the testimony of Floyd Brooks was that when he went to the dam the second time, sometime after 11 a.m., the dam was then giving way and some of the spillway had already gone out, and E. L. Elliott, president of defendant company, admitted when he went to the dam at five minutes after twelve noon, there was an opening in the dam "twice the length of the spillway" through which water was pouring.

These facts synchronized with the flood conditions as testified to by several witnesses who saw a large wave of muddy or dark colored water suddenly rush down the stream at about 11:30 a.m., sweeping buildings, logs and trees before it; as well as the testimony of Kilduff, that about 11:40 to 12 o'clock noon the water was at its highest in the streets and was then eight feet in depth, from which height it proceeded to drop to four feet. Defendant offered no testimony to dispute Kilduff's testimony as to this height of water in the streets of the borough at 12 o'clock noon. The witness, Sinon, gave some corroboration on this in saying the water in the stream at the northern edge of the borough began to drop shortly after the big wave he saw pass at 11:30. From all this the jury could find convincing evidence that this dam gave way about 11:30 a.m. or a few minutes before that.

Also, as bearing on the question of the force of the current of the flood water from this dam, we feel it

significant to point out that Gerald T. Shipman, called by defendant, testified he was an employe of defendant on the date of the flood and on the day after he noticed the switch engine, used by defendant in and about its plant, was located at a point along the North Branch stream, 1,000 feet below where it had been standing just before the flood waters reached it. The jury in weighing the testimony of whether water flowing from the breach of this dam caused the damage to the streets complained of and which streets are situated not far from where this engine was found, might fairly conclude that it took a powerful current of water to lift this switch engine off the rails and carry it down stream 1,000 feet.

In view of the direct, positive testimony of the several witnesses as to the rush of flood water that came down the North Branch of Freeman Run, carrying buildings, large logs, trees and other debris, some of it showing plainly on the photographs of Main Street, taken the following day, including the carrying of a switch engine 1,000 feet down the stream, and the undisputed testimony of Kilduff that there was eight feet of water on the streets at 11:40 to 12 o'clock noon, the jury, in weighing this direct testimony against the opinion of Mr. Ryder, based on some engineering theory or formula, to wit, that all of the water in the dam, if released within an hour's time, would not make more than a foot of water on the borough streets —may have concluded that theories and formulas sometimes have to give way to concrete facts.

In passing on the question of whether defendant was negligent and, if so, whether it was a substantial factor in causing the damage complained of, we conclude there was sufficient, competent testimony adduced on behalf of plaintiff from which the jury could find defendant was liable in damages.

The trial judge instructed the jury that the measure of damages for the injuries alleged to have been done

to the streets, claimed in this suit, is the amount required to restore them to the same condition as they were in immediately before this flood took place on July 18, 1942.

It appears that following this flood the Borough of Austin expended the sum of $10,000 in repairing various streets, and that many of these repairs were but temporary. Bernie Baker, acting as clerk for the borough council, produced the books and records of council as to the flood repairs and testified he did not keep the accounts for these repairs separate so as to tell just what amounts were expended on the different streets, therefore, the borough was not able to allocate definitely the respective amounts expended on the streets that were repaired.

However, there was one item that Baker said was expended on two streets; to wit, it appears that the borough employed Harford Brothers & Company to repave the cartway or street pavement of Turner and Elliott Streets, and on that contract it was paid the sum of $3,224.77. Therefore, the court told the jury that that amount is fixed and is not subject to estimate. The jury was also instructed if they found those two streets were damaged by high water from defendant's dam that would be the sum they could award the borough for the partial repairs made to those two streets.

The court further instructed the jury that in passing on the question of damages it should consider only the damages of five streets, to wit, the sum already paid by the borough for partial repairs to Elliott and Turner Streets as mentioned, and the amount necessary to complete the repairs on Goodyear Avenue, Main Street, and for relocating and repairing the channel of the North Branch of Freeman Run.

As to the damage to Main Street, the testimony shows the cartway has been repaved but it is undisputed the sidewalks on both the north and south sides

of the street had not been replaced or repaired. It appears from the testimony these sidewalks were double the regular width of street sidewalks. The testimony as to the estimated cost for repairing those sidewalks was given by the engineer, Norman Sprague, who testified it would require 8,000 square feet of sidewalk, and curbing repairs of 100 cubic feet, at a cost of $2,500.

As to the damage to Goodyear Avenue, which, it was shown by witnesses, had been paved with brick before the flood, and it is undisputed that the street pavement had been washed out, Mr. Sprague estimated that to repair this street it would require excavating 530 cubic yards, curbing of 800 cubic feet, pavement of 1,600 square yards, and 1,000 square feet of concrete sidewalks, at a total cost of $8,780.

As to the claim for damages to repair the channel of the North Branch of Freeman Run, there was testimony that this channel was changed or diverted, for a considerable distance, by the force of this flood, that it was diverted from the east side of defendant's pulp mill to the west side, and the channel was washed out and filled with debris and to properly repair it required the cleaning out of the debris and repairing the sides or banks of the channel. The engineer, Sprague, estimated that it would require excavating of 5,250 cubic yards at a cost of $7,785, to repair this channel.

The jury was instructed these estimates were made by Mr. Sprague after it had been testified to by Mr. Colvin, of the borough council, as to what portion of the work had been done and these estimates given by Mr. Sprague represent what it would cost to complete the repairs to Goodyear Avenue, Main Street and the channel of Freeman Run.

In making his estimates Mr. Sprague said they would cover all costs in making repairs, including the necessary labor, equipment and materials and his esti-

mates are based on the unit prices then prevailing for similar labor and materials in the year 1942.

As to the condition of these streets immediately before the flood, Dr. Glenn, president of borough council, said Main Street was paved in the cartway and had double concrete sidewalks on both sides of the street and after the flood these were all washed away and left the street in bad condition. As to Goodyear Avenue from Main Street to the railroad station, Dr. Glenn testified the street had been paved with bricks but they were all washed out by the flood, that two thirds of the street is completely washed out and still remains in the same condition, and that the sidewalks and curbing were damaged. As to the channel of Freeman Run Dr. Glenn testified before the flood it would not have been necessary to make any change in the channel in the vicinity of the pulp mill, and that the borough had done some repairs on the channel since the flood.

Clarence L. Colvin, a member of the borough council, testified the cartway of Main Street had been repaved but the concrete sidewalks on both sides had not been repaired; as to Goodyear Avenue, Colvin said that street had been paved with brick and all of the street surface had been washed away by the flood, that the street has been filled in at places and two thirds of the length of the street needs to be repaired. As to the channel of Freeman Run, Colvin testified the flood had washed out and diverted the channel so between defendant's paper mill and Elliott Street a new channel had been cut, running from the main stream toward Railroad Street and then circled and came back to the main stream, that this channel was filled with debris, and before the flood it had been clear; that some work had been done to return this channel to its original course, and about one fourth of the cleaning out of the debris had been done; Colvin said the part of the channel to be repaired is about one half mile

in length and about one half of the necessary excavating has been done.

M. L. Smith, a civil engineer, called by defendant, testified he visited the Borough of Austin recently to examine the damage done to these streets, but admitted he did not check or inspect conditions on Main Street or the damage to the channel of the stream. As to Goodyear Avenue, Smith said he found 100 feet of curbing bent over which he thought could be straightened up and used, and did not think it needed 800 feet of curbing as testified to by Sprague, which would mean 400 feet of curbing on each side of the street. However, Smith did not say how much curbing, in his opinion was needed. Smith testified also that the brick paving in the cartway was practically all gone and he found 65 cubic feet of sidewalk undermined and not in good condition; he said he did not question the damage to the cartway of the street.

Bernie Baker, a councilman and clerk of the council, testified before the flood the condition of the paving of all these streets was good.

Mr. Sprague, the engineer, testified he had examined the several streets and sidewalks for the purpose of determining the composition, construction and manner in which they had been paved, also to determine the probable age and other elements showing the condition of those streets immediately prior to July 18, 1942; as to those streets there would be three items of work necessary, to wit, the grading, laying of pavement and concrete sidewalks. And he further testified he was able, on his examination, to determine from the remnants of a street or sidewalk what material had been used in paving the street or laying the sidewalk, and he knew the necessary square feet of paving and sidewalk material and other items necessary to make up the necessary cost to do the work.

Sprague testified he made all his estimates as to the total repairs to be made on these several streets some

months after the flood occurred and he had revised and reduced the amount of these estimates after hearing the testimony of Mr. Colvin, a member of borough council, as to what proportion of the work of repair on Goodyear Avenue, Main Street and the channel of the run had been done and what proportionate share yet remained to be done.

As to the testimony of Dr. Gerald Glenn and Clarence Colvin and Bernie Baker, members of the borough council, as to the condition of these streets immediately before the high water of July 18, 1942, and their condition immediately after the flood and as to the competency of Mr. Colvin to testify to what proportion of the repairs had been made on said streets, the court feels there is ample authority showing that a layman is competent to describe to the jury such conditions. See Gandy v. Klaw et al., 269 Pa. 320; Kennedy, Jr., v. Loose-Wiles Biscuit Company, 94 Pa. Superior Ct. 602; and Markowitz v. P. & C. R. R. Co., 216 Pa. 535.

As to the qualifications of Clarence L. Colvin to describe to the jury the conditions of the streets before and after the flood and estimate and describe what proportion of the work of each street involved had been completed, and what proportion yet remained to be done, it appears that Colvin has been a resident of the Borough of Austin since 1919; that he was borough treasurer for many years, and at the time of this flood disaster was placed in charge of all the work of restoration of the borough property. We are of the opinion that this qualified him to state to the jury the proportions of the repairs already done and that remaining to be done: Strauch v. Pittsburgh, 70 Pa. Superior Ct. 251.

At the conclusion of the testimony in chief by Colvin opportunity was given to counsel for defendant to cross-examine Colvin and elicit such further details as may have been desired by defendant. In view of the

failure so to do we feel defendant cannot now, in good grace, raise such questions.

In Hufnagle v. Delaware & Hudson Co., 227 Pa. 476, which was a case involving damage to land by flood or high water, the Supreme Court said:

"The plaintiff and his witnesses gave testimony sufficiently describing the character and condition of his property before the floods which caused the damage; thereafter witnesses were offered to state the expense of restoring the land to its prior condition. The fact that some of these witnesses had not gained their knowledge of the condition of the land prior to the floods by personal investigation would not debar them from giving the cost of restoring the property to the condition the other witnesses said it had then been in."

That Mr. Sprague, an engineer of long experience in road construction work, revised and based his estimates after hearing the testimony of Mr. Colvin, was, we think proper and competent.

It was said in Jackson et ux. v. U. S. P. L. Co., 325 Pa. 436, where the court quoted from 1 Wigmore on Evidence §27, as follows:

" 'The conclusion and tests of everyday experience must constantly control the standards of legal logic. . . . It is equally obvious that inferences may be founded on inferences as they are in the investigations carried on by scientific men and in the everyday affairs of life.' "

And in Mengell's Executors v. Mohnsville Water Co., 224 Pa. 120, the Supreme Court said at page 123:

"Hence, subject to the requirement that the qualifications of a witness to give an opinion must appear and be passed upon by the court before he is permitted to do so, . . . the rule still obtains that, if upon his preliminary examination he is shown to have any pretentions to speak on the matter, his competency to do so rests much in the discretion of the Trial Judge, . . . the value and weight of the opinion expressed being,

of course, a matter entirely for the jury": . . . Michael v. Crescent Pipe Line Co., 159 Pa. 99, 104; Oil Co. v. Gilson, 63 Pa. 146.

In White Deer Creek Improvement Co. v. Sassaman, 67 Pa. at page 415, the court said:

"As to unliquidated damages, the result of an injury complicated in its circumstances, a witness acquainted personally with all the facts must be permitter to give his opinion. Such matters are difficult of descriptions, very few men being gifted with that power of description of complex subjects which can picture them to the minds of others, so as to convey a true idea of the reality. An opinion of total or aggregate loss or value is therefore permitted to go to the jury as some evidence of the fact."

In Pennsylvania Trial Evidence, Henry, §326, 471, the court said:

"Where the extent of damage to real or personal property depends upon its market value, a description cannot adequately convey to the jury the information required to form the basis of an intelligent estimate of such value, and it is therefore necessary to resort to the opinion of witnesses, who are personally acquainted with the property, or who have special knowledge thereof, though they may not be technically experts. Such opinions must be based upon facts proved, and the measure cannot be estimated in a lump sum without specifying the items which form the basis of the opinion; and if the witness has given the total value of property he should then be permitted to read the items from which he made it up, so that the jury may judge of the reliability of his estimate.

"The competency of such witness is largely within the discretion of the trial judge whose decision will not be reviewed unless clear abuse of discretion is shown. The extent of the knowledge of the witness will affect the weight of his testimony, but will not disqualify him if it appears he has some familiarity with the subject."

And in Strauch v. Pittsburgh, 70 Pa. Superior Ct. 251, which was an action brought for damage to land by high water, the court said (p. 255):

"In the first and sixth assignments complaint is made that the witnesses were permitted to testify as to the cost of repair necessary to restore the buildings in a 'lump sum'. The subject was one on which each of the witnesses had knowledge. One of them was a builder and contractor and no sufficient reason appears why they might not testify as to what the reconstruction of the premises would probably cost. If the defendant desired detailed information or to test the accuracy of the knowledge of the witnesses that could have been done on cross-examination."

There was no other testimony offered by either plaintiff or defendant as to estimates of the cost required to complete the repairs to Goodyear Avenue, Main Street and the channel of Freeman Run.

The four specific items of damage which were submitted to the jury were made up as follows: The amount paid Harford Brothers Company for repairs to Elliott and Turner Streets, $3,224.77; the amount of the estimates made by engineer Sprague for cost of repairs to Main Street $2,500; to Goodyear Avenue $8,780, and the channel of Freeman Run $7,875, making a total of $22,379.77.

The trial judge instructed the jury that any findings as to damage should be confined to these four items. However, the jury returned a verdict in favor of the plaintiff in the sum of $35,000.

We conclude that under the testimony and the instructions of the court the verdict should be reduced to conform substantially to the amount of these estimates and the sum paid Harford Brothers Company.

### Order

And now, to wit, August 12, 1947, the motion for judgment non obstante veredicto filed by defendant is

refused, and upon the filing of a remittitur, within 10 days, by plaintiff in the sum of $12,500, defendant's motion for a new trial is refused and the prothonotary is directed to enter judgment on the verdict in favor of the Borough of Austin, plaintiff, and against the A. & P. Corrugated Box Corporation, defendant, in the sum of $22,500, upon payment of the jury fee; otherwise a new trial is granted.